**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PAMELA C. LOCKS,** | ) | |
|   **12307 Quintette Lane** | ) | |
|   **Bowie, MD 20720,** | ) | |
| | ) | |
|   **Plaintiff,** | ) | |
| | ) | |
|   **v.** | ) | **Civ. Action No.** |
| | ) | |
| **JACOB J. LEW,** | ) | |
|   **Secretary of the Treasury** | ) | |
|   **1500 Pennsylvania Ave., NW,** | ) | |
|   **Washington, D.C. 22020,** | ) | |
| | ) | |
|   **Defendant.** | ) | |
| | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Preliminary Statement**

1.) Pamela C. Locks, the plaintiff in this action, served as Director of the Security Division (GS-15) in the Comptroller Directorate/Office of the Assistant Commissioner for Management within the Financial Management Service of the U.S. Department of the Treasury from January 6, 2006, until February 26, 2012. The primary function of the Security Division of the Financial Management Service is to protect and secure all agency assets and employees through a personnel, physical and information security program, emergency management and administrative investigations. Ms. Locks, who is an African American female, served with distinction in her former position. Throughout her six year tenure as Director of the Security Division, until the actions that comprise the subject matter of this Complaint, all of Ms. Locks' annual performance appraisals were at the Outstanding level and she received annual awards every year for her performance.

2.)     In November of 2008, a temporary student clerk two levels down from Ms. Locks, Cordarryl Brown, was arrested while stopped for a traffic violation.  Mr. Brown informed one of Ms. Locks' second level subordinates, a Personnel Security Specialist, about the arrest.  The specialist in turn advised Mr. Brown to advise his immediate supervisor, Jolinda Agnew, a Personnel Security Branch manager about this matter, which he did.  On his own, Mr. Brown brought the arrest to the attention of Ms. Locks.

3.)     Traffic violations and arrests during traffic stops were not used to deny applicants employment in the Financial Management Service unless it involved a driver or motor vehicle operator position, or to discipline incumbent employees of the Security Division. No action was taken against Mr. Brown for those offenses since he had not been convicted of any crime at the time Ms. Locks was informed about his arrest.

4.)     Three years later, in October of 2011, Mr. Brown submitted a personnel security questionnaire to update a higher level background investigation, which all student interns within the Security Division were required to update at Ms. Locks' direction.  The Personnel Security Specialist who had previously advised Mr. Brown to disclose his arrest in 2008 saw that Mr. Brown had not listed it and instructed Mr. Brown to disclose his original arrest and any subsequent arrests when he re-submitted the form.  When he did, Mr. Brown also disclosed for the first time that he had been arrested twice more earlier in 2011.

5.)     Ms. Locks took no action regarding Mr. Brown because she knew nothing of his two arrests in 2011.  Before they were brought to her attention, the Office of Inspector General ("OIG") of the Treasury Department received an anonymous complaint which falsely alleged that Ms. Locks had been covering up for Mr. Brown and was threatening to terminate any employees who disclosed that she was doing so.

6.)     OIG conducted an investigation into this matter beginning on October 25, 2011. When interviewed by OIG later that month, Ms. Locks confirmed that she had no knowledge of Mr. Brown's arrests in 2011, until they were brought to her attention by the OIG investigators.  In her initial interview, Ms. Locks mistakenly stated that she also learned of Mr. Brown's original arrest in 2008 in October of 2011.  In a follow-up interview, Ms. Locks informed OIG that she learned of Mr. Brown's original arrest shortly after it occurred in 2008.

7.)     On December 23, 2011, OIG completed a report and forwarded it to Assistant Commissioner for Management within the Financial Management Service, Patricia Marlene Greiner.  The report confirmed that Mr. Brown had been arrested three times and had not disclosed any of his arrests on his required updated personnel security questionnaire until prompted.  In short order, Mr. Brown was terminated by Ms. Greiner's Deputy Chief Financial Officer and Comptroller, Kent Kuyumjian.

8.)     The OIG report also found that Ms. Locks knew about Mr. Brown's original arrest in 2008 but did not report it to the OIG and that she did not mention having learned about that arrest in her original interview with investigators.

9.)     On February 17, 2012, Ms. Greiner and/or Mr. Kuyumjian gave Ms. Locks an Oral Admonishment Confirmed in Writing, issued Ms. Locks' 2011 performance appraisal at the level of Exceeds Expectations instead of Outstanding, and reassigned Ms. Locks from her supervisory position as the Director of the Security within the Financial Management Service to a non-supervisory position without meaningful or high level professional duties.  Defendant also rescinded Ms. Locks' selection for the newly created position of Director the Enterprise Security Operations Division.

10.)     The supposed basis for defendant's actions was Treasury Directive No. 40-01, an update to a Treasury directive that was close to 20 years out of date, that defendant issued almost three years after Mr. Brown's original arrest in 2008; and an IG Memo that was also issued after Mr. Brown's original arrest.  Although the Treasury Directives and the IG Memo called for criminal acts and misconduct to be reported to the Treasury OIG, they were routinely not observed by defendant, even in cases of gross waste of government resources and financial mismanagement when committed by Caucasian employees.  Defendant also alleged that by forgetting in her original interview that she had known about Mr. Brown's arrest in 2008 shortly after it occurred, Ms. Locks supposedly showed a lack of candor which led the OIG to refuse to coordinate its activities with her.

11.)     This case seeks redress for defendant's discrimination against Ms. Locks on account of her race in taking the employment actions specified above, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.  In it, Ms. Locks seeks:  a.) reinstatement in a position comparable to her former position as Director of the Security Division within  the defendant's former Financial Management Service, her intended position as Director the Enterprise Security Operations Division, or in a comparable position; b.) expungement of the Oral Admonishment Confirmed in Writing issued by defendant on February 17, 2012; c.) an increase in her appraisal to the Outstanding level for 2011 and a commensurate cash bonus; d.) compensatory damages; and e.) an award of all attorneys' fees and costs.

**Parties, Jurisdiction, And Venue**

12.)     Plaintiff Pamela C. Locks was, at all times relevant until the actions which gave rise to this Complaint, the GS-15 supervisory Director of the Security Division in the Comptroller Directorate/Office of the Assistant Commissioner for Management within the Financial

4

Management Service of the U.S. Department of the Treasury. Ms. Locks is an African American female and resides at the address recited in the caption of this Complaint.

13.) Defendant Jacob J. Lew is the Secretary of the Treasury, the Cabinet official who heads the Department of the Treasury and is sued in his official capacity only. The Department of the Treasury is a department in the Executive Branch of the federal government, the mission of which includes promoting economic growth through financial and fiscal policies to support job creation, investment, and economic stability.

14.) Jurisdiction of this Court is based on and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c). Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because the discriminatory actions at issue in this proceeding were taken in this judicial district. Specifically, the actions that comprise the subject matter of this proceeding were those specified above in paragraph 9 which were taken by Ms. Greiner and Mr. Kuyumjian from their duty stations in this judicial district.

## Statement Of Facts

### Background

15.) From January 6, 2006 until February 26, 2012, when defendant took the actions that comprise the subject matter of this Complaint, Pamela C. Locks served as the Director of the Security Division in the Comptroller Directorate/Assistant Commissioner for Management within the Financial Management Service ("FMS") of the U.S. Department of the Treasury ("Treasury"). Ms. Locks, who is an African American female, was competitively selected for the position that was the predecessor to the FMS Director of Security and, after a reorganization in 2007 that enhanced the responsibilities of her former office, she became Director of FMS Security Division.

16.)     The functions of FMS include, but are not limited to, providing central payment services to many federal agencies, operating the federal government's debt collections and deposit systems, providing government-wide accounting and reporting services, managing the collection of delinquent debt owed to the Government, and guarding against fraud in payment and collection of government debts and expenses.

17.)     The FMS Security Division was, at all times relevant, located in the Comptroller Directorate within the Office of the Assistant Commissioner for Management.

18.)     At all times relevant, Ms. Locks' first line supervisor was Kent Kuyumjian and her second line supervisor was Patricia ("Marty") Greiner.

19.)     As Director of Security, Ms. Locks was responsible for heading the front line defense for all FMS assets and business lines, through the FMS physical security, personnel security, information security, and emergency management programs as well as administrative investigations related to fraud, waste and abuse, data breaches and misconduct.  Through a staff of seasoned Security Specialists, Ms. Locks implemented all HSPD-12 requirements related to personal identity verification and credentialing; provided physical access controls for FMS facilities; maintained and upgraded access control and monitoring equipment; developed guidance and training for document security to include classified information; managed the FMS Continuity of Operations Plan and emergency response program; and conducted administrative investigations triggered by incident reports or as requested by the Office of Inspector General.  She also prepared and presented briefings to the Executive Board and participated in high level meetings to make related decisions.

20.)     On August 15, 2011, Ms. Locks was selected for a newly created position in a reorganization of the Financial Management Services information technology organization as

Director of the Enterprise Security Operations Division.  The functions of this position were very similar as those of the Director of the Security Division and as Director, Ms. Locks was slated to have approximately 20 professional employees under her supervision.  Although Ms. Locks was selected for this position, the reorganization that would have placed her in it was not completed before she was removed as FMS Director of the Security Division, and defendant rescinded her selection.

## Cordarryl Brown's Arrests

21.)    In November of 2008, Cordarryl Brown, a temporary Student Clerk two levels down from Ms. Locks, was arrested while stopped for a traffic violation.  Mr. Brown informed one of Ms. Locks' second level subordinates, Personnel Security Specialist Allan Small, about having been arrested while driving.  Mr. Small learned from Maryland court records that Mr. Brown's offenses were having a small amount of marijuana and materials for smoking it in his vehicle.  Mr. Brown claimed these items belonged to a friend who had ridden in his car.

22.)    Offenses of similar severity are routinely disclosed by successful applicants for positions at various levels in the Financial Management Service, are not grounds for mandatory dismissal, and were not generally used as a basis for dismissing junior or even more senior employees.  For that reason, Mr. Small did not initiate any action against Mr. Brown or recommend that any action be taken against Mr. Brown, but instead informed Mr. Brown to bring his infraction to the attention of his first level supervisor, Jolinda Agnew, the Branch Manager for FMS Personnel Security.  Mr. Brown did so and Mr. Small also informed Ms. Agnew about the arrest.  Mr. Brown voluntarily mentioned his arrest to Ms. Locks.

23.)    In September of 2011, Mr. Brown submitted forms to update his background investigation that Ms. Locks had directed for of all student interns.  Upon reviewing the completed

personnel security forms, Mr. Small noticed that Mr. Brown had not listed his arrest in 2008, and

counseled Mr. Brown to disclose his entire arrest record when he re-submitted the form.  When

Mr. Brown did so, for the first time Mr. Brown disclosed that he had been arrested in February of

2011, after he failed to appear in court for a traffic offense that was subsequently dismissed.  Mr.

Brown also disclosed that he was arrested another time in June of 2011, after he failed to appear

in court about his 2008 traffic offense, that was dismissed with a small fine, and a short probation

and community service.

24.)     Ms. Locks took no action because she knew nothing of Mr. Brown's arrests in 2011.

25.)     Before Mr. Brown's arrests in 2011 were brought to Ms. Locks' attention, the

Treasury OIG received an anonymous complaint that Ms. Locks had been covering up for Mr.

Brown and was threatening to terminate any employees who disclosed that she was doing so.

26.)     Ms. Locks was not involved in hiring Mr. Brown and, although his grandmother

worked at Treasury while he did, Ms. Locks was not acquainted with her.  Neither did Ms. Locks

make any threats to any of defendant's employees in any way regarding her interactions with Mr.

Brown.

## OIG Investigation

27.)     Beginning on October 25, 2011, OIG conducted an investigation into this matter

which, in great part, consisted of interviewing Mr. Brown and defendant's employees who knew

or might have known of his record of arrests.

28.)     Ms. Locks was initially interviewed by OIG on October 28, 2011, and stated that

she had no knowledge of Mr. Brown's arrests in 2011, until they were brought to her attention by

the investigators.

8

29.)    In her initial interview, Ms. Locks mistakenly stated that she also learned of Mr. Brown's original arrest in 2008 in October of 2011.  In a follow-up interview on November 17, 2011, Ms. Locks informed OIG that she had learned of Mr. Brown's original arrest shortly after it occurred in 2008.

30.)    OIG completed its report into this matter on December 23, 2011.

31.)    The OIG report confirmed that Mr. Brown had been arrested three times and not disclosed any of them on his periodic employee questionnaire update until prompted in September of 2011.

32.)    The OIG report also concluded that Ms. Locks was required to but did not report Mr. Brown's original arrest in 2008 to OIG, and noted and that Ms. Locks had not informed the OIG investigators in her first interview that she knew about Mr. Brown's original arrest when it occurred in 2008.

**Defendant's Adverse Employment Actions**

33.)    On December 23, 2011, OIG forwarded its report to Assistant Commissioner for Management for the Financial Management Service Greiner (Caucasian female) who in turn transmitted the report to her Deputy, Chief Financial Officer and Comptroller, Kent Kuyumjian (Caucasian male).

34.)    On February 17, 2012, Mr. Kuyumjian terminated Mr. Brown on the ground that he had been arrested on three occasions and yet not reported any of them on his updated employment questionnaires until specifically asked about them.

35.)    On February 17, 2012, Ms. Greiner and/or Mr. Kuyumjian gave Ms. Locks an Oral Admonishment Confirmed in Writing, issued Ms. Locks' 2011 performance appraisal at the level of Exceeds Expectations instead of Outstanding as it had always been, and reassigned her from

her supervisory position as the Director of Security of the Financial Management Service to a non-supervisory position without meaningful or high level professional duties.

36.)     The supposed basis for defendant's actions was Treasury Directive No. 40-01, an update to another Treasury Directive close to 20 years out of date, that was issued after Mr. Brown's original arrest in 2008; and an IG Memo that was issued on January 21, 2009, three months after Mr. Brown's original arrest.  Although the Treasury Directive and the IG Memo called for defendant's employees to report criminal acts and misconduct to OIG, they were routinely not observed, even when Caucasian employees had been responsible for gross waste of government resources and serious financial mismanagement.  Defendant also alleged that by forgetting in her original interview that she had known about Mr. Brown's arrest in 2008 shortly after it occurred, Ms. Locks supposedly showed a lack of candor which led the OIG to refuse to coordinate its activities with her.

37.)     In taking the foregoing actions against Ms. Locks, defendant treated her disparately on account of her race.

38.)     For example, Ms. Greiner, Mr. Kuyumjian, and other senior Treasury officials knew that a Caucasian FMS IT specialist had caused the waste of more than $40,000.00 of government funds when the specialist improperly permitted his children to misuse his Treasury-issued computer equipment.  The same Treasury Directives and IG Memo that provided grounds for defendant's actions toward Ms. Locks also called for Ms. Greiner, Mr. Kuyumjian, and other senior officials to report the IT specialist's misconduct to the OIG.  Nonetheless, they failed to do so until Ms. Locks and her counsel demonstrated that faulting Ms. Locks for not reporting Mr. Brown's original arrest constituted disparate treatment.

39.)     David Lebryk (Caucasian male), Commissioner of Treasury's Bureau of Fiscal
Services and Ms. Locks' fourth line supervisor, engaged in gross negligence or misconduct by
permitting a foreign national employed by the Federal Reserve Bank of New York to have access
to a government-wide accounting system source code, in violation of Treasury Directive No. 15-
71.  Despite the fact that this misconduct became the subject of an investigation by the FBI and
was widely reported in the news media, Mr. Lebryk was not the subject of an OIG investigation
and defendant did not discipline Mr. Lebryk or take any other adverse employment action against
him.

40.)     The Financial Management Services' Assistant Commissioner for Debt
Management Services (Caucasian male), who was responsible for heading, as Director, Treasury's
Birmingham Debt Management Operation Center which collected delinquent government debts,
engaged in gross negligence or misconduct by allowing Treasury's Routing Transit Numbers
("RTNs") to fall into the public domain on two separate occasions.  As a result of the second
incident, Treasury was defrauded out of close to $4 million, which was only recovered through a
massive audit to ascertain and reverse unauthorized financial transactions.   Nonetheless, Mr.
Lebryk did not refer this Director's misconduct to the OIG, discipline him, or take any other
adverse employment action toward this Director.  Neither was Mr. Lebryk sanctioned for failing
to do so.

41.)     When defendant took the adverse employment actions against Ms. Locks on
February 17, 2012, defendant also rescinded Ms. Locks' selection on August 15, 2011, for the
newly created supervisory position of Director the Enterprise Security Operations Division. [1]

---

[1]   Although Ms. Locks had been selected for this position, the on-going reorganization of
Enterprise Security Operations Division had not been completed before defendant took the actions
specified above.

42.)   Since rescinding Ms. Locks' selection as Director of the Enterprise Security Operations Division, defendant has appointed a Caucasian female far less qualified than Ms. Locks to the position on an acting basis.

### Exhaustion of Administrative Remedies

43.)   On March 6, 2012, Ms. Locks timely initiated the informal agency EEO process for the employment actions that comprise the subject matter of this action.  On June 15, 2012, Ms. Locks timely filed a formal complaint of discrimination concerning these matters.  On May 8, 2013, Ms. Locks filed a request for a hearing with the Equal Employment Opportunity Commission.  More than 180 days have elapsed without the issuance of a final decision by the EEOC.  In these ways and others, Ms. Locks exhausted the administrative remedies available to her about the claims she is raising in this action.

### COUNT I
### (Race Discrimination)

44.)   Plaintiff repeats the allegations contained in paragraphs 1 through 43 as though fully set forth here.

45.)   Plaintiff is an African American female.

46.)   On February 17, 2012, defendant gave Ms. Locks an Oral Admonishment Confirmed in Writing, issued Ms. Locks' performance appraisal for 2011 at the level of Exceeds Expectations instead of Outstanding as she uniformly received, reassigned her from her supervisory position as the Director of Security of the Financial Management Service to a non-supervisory position without meaningful professional duties or exposure or opportunity for career advancement, and rescinded plaintiff's selection on August 15, 2011, for the newly created supervisory position of Director the Enterprise Security Operations Division.

47.)     In taking the foregoing actions, defendant altered the terms, conditions, benefits, and privileges of plaintiff's employment in one or more objectively tangible ways and subjected plaintiff to one or more adverse employment actions.

48.)     The bases for defendant's actions was plaintiff's supposed non-compliance with Treasury Directive No. 40-01, an update to an outdated Treasury Directive, in failing to report the arrest of Cordarryl Brown in 2008; and an IG Memo that that was issued on January 21, 2009, three months after Mr. Brown's original arrest.

49.)     The Treasury Directives and the IG Memo which purported to call for defendant's employees to report criminal acts and misconduct to OIG were routinely not observed by defendant, even in cases of gross waste of government resources and financial mismanagement when committed by Caucasian employees.

50.)     Defendant also alleged that by forgetting in her original interview that she had known about Mr. Brown's arrest in 2008 shortly after it occurred, Ms. Locks supposedly showed a lack of candor which led the OIG to refuse to coordinate its activities with her.

51.)     In taking the foregoing actions against Ms. Locks, defendant discriminated against plaintiff on account of her race.

52.)     Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2)), because defendant discriminated against Ms. Locks on account of her race in taking the foregoing actions.

53.)     Defendant's violation of plaintiff's civil rights caused her to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life, and impairment of present and future career opportunities.

## PRAYER FOR RELIEF

Wherefore, plaintiff Pamela C. Locks respectfully requests that the Court enter judgment in her favor and award her the following relief.

A.      An Order declaring that defendant violated plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

B.      An Order reinstating plaintiff in a position comparable to her former position as Director of the Security Division of defendant's Financial Management Service, her intended position as Director the Enterprise Security Operations Division, or in a comparable position.

C.      Expungement of the Oral Admonishment Confirmed in Writing issued by defendant on February 17, 2012, and other record correction.

D.      An increase in plaintiff's 2011 appraisal to the Outstanding level and a commensurate cash bonus.

E.      Compensatory damages in an amount to be determined at trial to compensate plaintiff for her concrete pecuniary losses; and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life caused by defendant's unlawful actions.

F.      The attorneys' fees and costs incurred by plaintiff.

G.      Such other relief as may be just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

Robert C. Seldon, Esq.
D.C. Bar No. 245100

Charlene Bofinger, Esq.
D.C. Bar No. 368879
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W.
Suite 200
Washington, D.C. 20004
(202) 393-8200

Counsel for Plaintiff