# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAMELA C. LOCKS,<br>  Plaintiff,<br><br>            v.<br><br>JACOB J. LEW, *Secretary of the Treasury,*<br>  Defendant. | **Civil No. 13-1777 (CKK)** |

## MEMORANDUM OPINION
(August 5, 2016)

Plaintiff, Pamela C. Locks, is a former employee of Defendant, the U.S. Department of the Treasury.  Plaintiff, who is African American, filed suit against Defendant, alleging that Defendant discriminated against her on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Presently before the Court is Defendant's [51] Motion for Summary Judgment.

Upon consideration of the parties' submissions,[1] the relevant legal authorities, and the record as a whole, the Court finds that Plaintiff has raised a genuine issue of material fact as to her claim of discrimination on the basis of race.  Accordingly, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's [51] Motion for Summary Judgment.  Specifically, the Court shall deny Defendant's Motion for Summary Judgment with regard to Plaintiff's discrimination claim, but shall grant Defendant's Motion for Summary Judgment with regard to Plaintiff's request for reinstatement in a position comparable to her former position as Director of the Security Division.

---

[1] The Court's consideration has focused on the following documents and their attachments: Defendant's Motion for Summary Judgment, ECF No. [51]; Plaintiff's Opp'n to Def.'s Mot., ECF No. [52]; Plaintiff's Notice of Filing, ECF No. [57], and Defendant's Reply, ECF No. [58].

# I.  BACKGROUND

## A.  Factual Background[2]

During the time period at issue in this case, Plaintiff, who is African American, was

employed by the Financial Management Service ("FMS"), a bureau of the U.S. Department of

the Treasury.  Def.'s Stmt. ¶ 1.  FMS was subdivided into several "Assistant Commissioner (AC)

Areas," including the AC Management / Chief Financial Officer (CFO) Area ("AC

Management"), in which Plaintiff served as Director of the Security Division, a GS-15 position,

between January 2006 and February 26, 2012.  *Id.* ¶ 2.  In her capacity as Director of the

Security Division, Plaintiff was responsible for overseeing employees who performed various

duties including, *inter alia*, conducting background investigations of FMS employees,

investigating employee misconduct, securely maintaining files that contained classified and

sensitive information, and coordinating with the Treasury Department's Office of Inspector

General ("OIG").  Def.'s Stmt. ¶ 3; Pl.'s Resp. Stmt. ¶ 3.[3]

On November 27, 2008, a clerk that worked in the Security Division named Cordarryl

Brown was arrested after a traffic stop and charged with possession of marijuana and possession

of paraphernalia.  Def.'s Stmt. ¶ 6.  Within a week or two of the arrest, Mr. Brown informed Ms.

Locks that he had been arrested and that the police had found marijuana paraphernalia in his car.

---

[2] The Court shall refer to Defendant's Statement of Material Facts ("Def.'s Stmt."), ECF No.
[51–1], to Plaintiff's Revised Statement of Genuine Issues ("Material Facts ("Pl.'s Stmt."), ECF
No. [57-1], or directly to the record, unless a statement is contradicted by the opposing party, in
which case the Court may cite to Plaintiff's Response to the Defendant's Statement of Material
Facts ("Pl.'s Resp. Stmt."), ECF No. [52–1], or to Defendant's Response to the Plaintiff's
Statement of Genuine Issues ("Def.'s Resp. Stmt."), ECF No. [58–2], where appropriate.

[3] The role of the Security Division at large was to oversee the security and protection of FMS
assets and business lines through personal security, physical security, information security,
emergency management programs, and administrative investigations.  Pl.'s Stmt. ¶ 1.

Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 73-74.  Mr. Brown did not mention that the police had also found marijuana.  Pl.'s Stmt. ¶ 74.  Ms. Locks did not follow up with Mr. Brown as to the outcome of any legal proceedings associated with his arrest, and she did not report the arrest to anyone in OIG.  Def.'s Stmt. ¶¶ 9, 10.

At least one other employee in the Security Division, a personnel Security Specialist named Allan Small, learned of Mr. Brown's arrest.  Pl.'s Stmt. ¶ 70.[4]  Mr. Small advised Mr. Brown that he should inform Ms. Locks of the arrest.  Def.'s Resp. Stmt. ¶ 71.  Mr. Small was unaware whether or not Mr. Brown's arrest was ever brought to Ms. Locks' attention, and Mr. Small never discussed it with her.  Pl.'s Stmt. ¶ 71.  Mr. Small also did not report the arrest to anyone in OIG.  Id. ¶ 72.

In the late summer or early fall of 2011, Ms. Locks requested that the two student interns in the Security Division, including Mr. Brown, undergo a background reinvestigation at the "moderate risk level."  Pl.'s Stmt. ¶ 78.  Ms. Locks instructed Ms. Agnew to initiate this re-investigation, and Ms. Agnew in turn directed Mr. Small to handle it.  Id. ¶ 79.  Upon Mr. Brown's completion of the background's electronic questionnaire, Mr. Small reviewed it and determined that he did not answer the police background history question accurately or fully enough.  Id. ¶ 80.  When Mr. Brown re-submitted his questionnaire, he revealed for the first time that in addition to his 2008 arrest, he had been arrested again in February of 2011 and had bench warrants issued in 2009 and 2011.  Id. ¶ 81.

In October 2011, the OIG initiated an investigation after receiving an anonymous complaint that an employee within the Security Division had been arrested and that the Director

---

[4] The parties dispute whether Mr. Brown's first-level supervisor, Jolinda Agnew, also knew of Mr. Brown's arrest in 2008.  See Def.'s Resp. Stmt. ¶ 68.

of Security was aware of the arrests and had not taken any action.  Def.'s Stmt. ¶ 13.  Ms. Locks

was interviewed twice by the OIG as part of the investigation, the first occurring in late October

2011 and the second occurring in November 17, 2011.  *Id.* ¶ 14.  During her first interview, Ms.

Locks told the OIG investigator that she had no knowledge of Mr. Brown's arrest in 2011 until it

was brought to her attention by OIG investigators and, as to Mr. Brown's arrest in 2008, that she

also did not learn of that arrest until October of 2011.  *Id.* ¶ 15.[5]  After Mr. Brown's interview

with the OIG, which was held on November 14, 2011, Mr. Brown contacted Ms. Locks, noting

that he had in fact told her about his arrest shortly after it occurred in 2008.  Pl.'s Stmt. ¶ 83.

OIG subsequently contacted Ms. Locks and scheduled another interview with her on November

17, 2011.  *Id.* ¶ 84.  During Ms. Locks' second interview, which OIG videotaped, Ms. Locks

stated that she had forgotten that Mr. Brown had informed her of the arrest back in 2008.  *Id.*

¶ 85.

On December 23, 2011, OIG issued a report finding that Ms. Locks knew that Mr. Brown

had been arrested in 2008, and that Ms. Locks "was made aware of the arrest by Brown in 2008,

but admitted that she never obtained any further details for two years."  OIG Report of

Investigation, ECF No. [53], at 9.  The OIG also found that Ms. Locks "initially reported to

[OIG] that Brown never informed her of his arrests[;] [h]owever, upon a second interview Locks

admitted Brown informed her, but she forgot."  *Id.*  The OIG Report included no discussion as to

whether Ms. Locks violated any policy for failing to report Mr. Brown's arrest, and it made no

recommendation as to whether any disciplinary action should have been taken against Ms.

Locks.  *See id.*; *see also* Pl.'s Stmt. ¶¶ 91-93.

---

[5] The parties dispute whether or not Ms. Locks, at the time of the OIG interview in October of
2011, had in fact forgotten that Mr. Brown had informed her of the arrest back in 2008.  *See*
Def.'s Resp. Stmt. ¶ 82.

On February 17, 2012, Ms. Locks' first-line supervisor, Kent Kuyumjian (a Caucasian male), and Ms. Locks' second-line supervisor, Patricia Greiner (a Caucasian female), met with Ms. Locks and told her that she would be reassigned from the Security Division Director position to a non-supervisory Program Manager position within the AC Management / CFO Area, without loss of grade or pay, effective February 26, 2012.  Def.'s Stmt. ¶ 21.  Ms. Locks' removal from her position as the Director of Security also "effectively revoked" the competitive selection of Ms. Locks to become the Director of the Enterprise Security Operations Division ("ESOD"), a position that she was competitively selected to assume upon the completion of a merger between FMS and the Bureau of Public Debt ("BPD").  Pl.'s Stmt. ¶ 98.  The ESOD Director position would have entailed greater responsibility, including greater supervisory responsibility than her position as the FMS Security Director, because multiple security entities would have merged under her supervision.  Pl.'s Stmt. ¶ 99.

Also at the February 17, 2012 meeting, Ms. Greiner and Mr. Kuyumjian gave Ms. Locks an "Oral Admonishment Confirmed in Writing,"[6] which stated that Ms. Locks had failed to "promptly report the arrest of a Treasury employee in accordance with Treasury Directive 40-01, Responsibilities of and to the Inspector General."  Oral Admonishment Confirmed in Writing, ECF No. [52-17].  Treasury Directive 40-01 states, in relevant part:

> "[A]ll department of the Treasury officials,  officers and employees are required to report promptly to the OIG any information or allegation coming to their attention that indicates that any Treasury . . . may have engaged in improper or illegal activity, including but not limited to a criminal or other illegal act and a violation of the Standards of Conduct or other Federal regulations."

---

[6] Under Defendant's personnel policy, an "Oral Admonishment Confirmed in Writing" is a "written informal statement of disapproval by a supervisor to an employee about a specific act of misconduct or violation of policy or procedure."  Def.'s Stmt. ¶ 25.  Under agency policy, an "Oral Admonishment Confirmed in Writing" is given to an employee, but not placed in the employee's Official Personnel File.  *Id.* ¶ 26.  The supervisor may retain a copy for one year from the issue date.  *Id.*

*Id.* (quoting Treasury Directive 40-01, Section 4 (Responsibilities, Parts 10(a) and (b)).

Mr. Kuyumjian also gave Ms. Locks her 2011 performance appraisal at the February 17, 2012 meeting.  Pl.'s Stmt. ¶ 112.  Ms. Locks received an overall rating of "Exceeds Expectations," the second highest rating in the Agency's appraisal system.  Def.'s Stmt. ¶ 27; s*ee also* Plaintiff's 2011 Performance Appraisal, ECF No. [52-18].  It was the first time in her tenure as Director of Security that she received an appraisal lower than the highest "Outstanding" level. *Id.*

In May 2012, Ms. Greiner offered Ms. Locks the position of Director, Administrative Programs Division ("APD"), which entailed supervising approximately 40 employees arranged in five branches performing facilities, supply services, and records management functions. Def.'s Stmt. ¶ 37.  Ms. Locks expressed reservations to Ms. Greiner about committing to the APD Director position without additional training, and asked Ms. Greiner for more time to consider the offer, citing health concerns.   Pl.'s Stmt. ¶ 117.  Ms. Greiner subsequently reconsidered her decision to reassign Ms. Locks into the APD Director position, as Ms. Greiner was "concerned about the stress the Director position might place on Ms. Locks and the possible impact that might have on her physical well-being."  Greiner EEO Declaration, ECF No. [52-37], at 23.  Ms. Greiner ultimately elected not to place Ms. Locks into the APD Director position.  *Id.*

On December 9, 2013, Ms. Locks applied for a Voluntary Separation Incentive Payment and voluntarily retired effective January 3, 2014.  *Id.* ¶ 43.

**B.  Procedural History**

Ms. Locks first contacted an Equal Employment Opportunity ("EEO") counselor on March 6, 2012, claiming she was discriminated against on the bases of age, race, and sex, when she was reassigned from the Security Director position; when she received a written

6

admonishment; when she received her 2011 performance appraisal and award; and in her current

working conditions.  Def.'s Stmt. ¶ 39.  Ms. Locks filed a formal EEO complaint on June 15,

2012.  *Id.* ¶ 40.

On November 8, 2012, the Equal Employment Opportunity investigator wrote to

Plaintiff, stating that the issue accepted for investigation was whether she was discriminated

against due to her age, race and sex when:

> (1) On February 17, 2012, she was issued a performance appraisal that lowered her rating from Outstanding to Exceeds Expectations;
> (2) On February 17, 2012, she was issued an Oral Admonishment Confirmed in Writing;
> (3) Effective February 26, 2012, she was reassigned from her Security Division Director position, GS-15 to a non-supervisory position, GS-15, performing administrative duties; and
> (4) In May 2012, management advised her that she would be moved into the Director, Administrative Programs Division, despite being reluctant to perform duties without training.

*Id.* ¶ 41.  Plaintiff replied to this letter through counsel, stating that she wanted to add an

allegation that Defendant retaliated and discriminated against her by denying her restored leave

on December 7, 2012.  *Id.* ¶ 42.

On November 12, 2013, Plaintiff filed her Complaint in the instant matter, alleging one

count of race discrimination, in violation of Title VII of the Civil Rights Act of 1964, as

amended.[7]  On May 15, 2014, the Court denied without prejudice Defendant's [10] Motion to

Dismiss, or in the Alternative, Motion for Summary Judgment, and granted Plaintiff's Motion to

Conduct Discovery.  *See* Order (May 15, 2014), ECF No. [24].  After the close of discovery,

---

[7] Although Plaintiff also alleged age and sex discrimination at the administrative level, she does not allege discrimination on the basis of age or sex in this lawsuit.  *See* Compl. ¶¶ 44-53.  In addition, Plaintiff does not allege in this lawsuit that Defendant retaliated or discriminated against her by denying her restored leave on December 7, 2012, or that Defendant discriminated against her when management advised her that she would be moved into the position of Director, Administrative Programs Division.  *See id.*

Defendant filed its [51] Motion for Summary Judgment.  *See* Def.'s Mot., ECF No. [51].  The motion is now fully briefed and is ripe for resolution.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## III.  DISCUSSION

Title VII of the Civil Rights Act makes it unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To allege a *prima facie* case, a plaintiff must show that she "is a member of a protected class," that she "suffered an adverse employment action," and that "the unfavorable action gives rise to an inference of discrimination." *Youssef v. F.B.I.*, 687 F.3d 397, 401 (D.C. Cir. 2012) (quoting *Stella v. Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002). There is no dispute that Plaintiff, who is African American, is a member of a protected class.

Plaintiff alleges that Defendant discriminated against her on the basis of race in four instances:  (1) the reassignment from the Security Division Director position to a non-supervisory Program Manager position; (2) the Oral Admonishment Confirmed in Writing; (3) the 2011 performance appraisal, and (4) the rescission of Plaintiff's selection for the Director of ESOD position.  *See* Pl.'s Opp'n, ECF No. [52], at 39-45.

## A.  Plaintiff's reassignment from the Security Division Director position to a non-supervisory Program Manager position

In order to bring a Title VII claim, a plaintiff must have suffered an adverse action.  *See Evans v. Sebelius,* 716 F.3d 617, 619 (D.C. Cir. 2013) (noting that an adverse action is a prerequisite for a Title VII claim) (citing *Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003)); *Patterson v. Johnson,* 505 F.3d 1296, 1298 (D.C. Cir. 2007) ("Liability for discrimination under Title VII requires an adverse employment action.") (citing *Brown v. Brody,* 199 F.3d 446, 452–55 (D.C. Cir. 1999)).  For purposes of Title VII discrimination claims, "[a]n 'adverse employment action' is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.' " *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small,* 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  "An employee must 'experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Id.* (quoting *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  The D.C. Circuit has cautioned that "not everything that makes an employee unhappy is an actionable adverse action."  *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001).  Indeed, in this respect, "courts are not 'super-personnel department[s] that reexamine[ ] an entity's business

decision[s].' " *Stewart,* 352 F.3d at 429 (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986)).

The Court finds that there is sufficient evidence in the record such that a reasonable trier of fact could find that Ms. Locks suffered an objectively tangible harm as a result of her reassignment from the Security Division Director position, which constitutes an adverse action. As a preliminary matter, it is undisputed that Ms. Locks was reassigned from the Security Division Director position to a *non-supervisory* Program Manager position.  Def.'s Stmt. ¶ 21. Standing alone, the withdrawal of "an employee's supervisory duties constitutes an adverse employment action."  *Stewart v. Ashcroft,* 352 F.3d 422, 427 (D.C. Cir. 2003).  It is also undisputed that Ms. Locks' removal from the Director of Security position "effectively revoked" the competitive selection of Ms. Locks to become the Director of the Enterprise Security Operations Division ("ESOD"), a position that she was competitively selected to assume upon the completion of a merger between FMS and the Bureau of Public Debt ("BPD").  Pl.'s Stmt. ¶ 98.  The ESOD Director position would have entailed greater responsibility, including greater supervisory responsibility than her position as the FMS Security Director, because multiple security entities would have merged under her supervision.  Pl.'s Stmt. ¶ 99.  As such, Plaintiff has produced evidence that the reassignment resulted in an objectively tangible harm in the form of lost promotion opportunities.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).

Defendant argues that Plaintiff has suffered no objectively tangible harm—and that her reassignment is therefore not an adverse action—because three months after Plaintiff was reassigned from the Security Division Director position to the non-supervisory Program Manager position, Ms. Greiner offered Plaintiff a supervisory GS-15 position—Director of the

Administrative Programs Division ("APD")—which entailed equivalent or greater supervisory duties. *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 23.[8] Defendant asserts that Plaintiff turned down the APD Director position, and that "but for her declination of this opportunity, Plaintiff's assignment to a non-supervisory GS-15 position would only have been temporary." *See id.* at 23-24.

It is undisputed that Ms. Locks expressed reservations about accepting the APD Director position; however, Defendant cites no evidence that Ms. Locks went so far as to turn down the position. *See* Def.'s Resp. Stmt. ¶ 118. Moreover, Ms. Greiner's own declaration states that *Ms. Greiner* reconsidered the decision to reassign Ms. Locks into the APD Director position and that *Ms. Greiner* was "concerned about the stress the Director position might place on Ms. Locks and the possible impact that might have on her physical well-being." Greiner EEO Declaration, ECF No. [52-37], at 23. In addition, Plaintiff has submitted evidence indicating that Ms. Locks requested more time to consider the offer, and that Ms. Greiner selected someone else for the position before Ms. Locks made a final decision. *See* Locks Decl., ECF No. [52-26], at ¶¶ 38-39. Accordingly, the Court finds that there is sufficient evidence in the record such that a reasonable trier of fact could find that Ms. Locks suffered an objectively tangible harm as a result of her reassignment from the Security Division Director position. *See Stewart*, 352 F.3d at 427.[9]

---

[8]  In Plaintiff's former position, Director of the Security Division, Plaintiff supervised approximately 20 employees arranged in two branches plus supporting staff; however, as Director of APD, Plaintiff would have supervised approximately 40 employees arranging in five branches, and she would have reported directly to Ms. Greiner, as opposed to having a first line supervisor and Ms. Greiner as her second line supervisor. *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 23.

[9]  For the reasons described above, the Court also finds unavailing Defendant's alternative argument that the Court should grant summary judgment on the reassignment claim on the

**B. Plaintiff's Oral Admonishment Confirmed in Writing and 2011 Performance Appraisal**

The Court also finds that there is sufficient evidence in the record such that a reasonable trier of fact could find that Plaintiff suffered an objectively tangible harm as a result of the Oral Admonishment Confirmed in Writing and her 2011 performance appraisal rating of "Exceeds Expectations," both of which were issued to Plaintiff during the February 17, 2012 meeting at which she was removed from the Security Division Director position.

The court begins by noting the general principle that unsatisfactory performance reviews and written admonishments that contain no abusive language, but rather job-related constructive criticism, are not actionable without tangible consequences. *See Baloch*, 550 F.3d at 1199. For example, in *Baloch v. Kempthorne*, the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") held that a letter of counseling, letter of reprimand, and an unsatisfactory performance review were not adverse actions where the reprimands contained no abusive language and plaintiff failed to produce evidence showing that the reprimands affected her "position, grade level, salary, or promotion opportunities." *Id.*; *see also Weber v. Battista*, 494 F.3d 179, 185-86 (D.C. Cir. 2007) (evaluations were "adverse actions insofar as they resulted in her losing a financial award or an award of leave"); *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006)("A lower score on [the employee's] performance evaluation, by itself, is not actionable . . . unless [the employee] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities."); *Whittaker v. N. Ill. University*, 424 F.3d 640, 647 (7th Cir. 2005) (reprimands unaccompanied by tangible harm were not adverse

_____

grounds that Defendant's offer of the APD Director position "moots" or "cures" the claimed adverse action. *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 23; *see also Youssef v. F.B.I.*, 687 F.3d 397, 402 (D.C. Cir. 2012) (rejecting defendant's summary judgment argument that materially adverse action was mooted where plaintiff was subsequently promoted).

actions because "job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship);.

In this case, Defendant argues that there is no genuine dispute of material fact that Plaintiff's Oral Admonishment Confirmed in Writing and Plaintiff's 2011 performance appraisal failed to have any tangible work-related consequences, such as a reduction in Plaintiff's grade level, salary, bonus, or promotion opportunities.  *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 15-21.  The Court disagrees and finds that that Plaintiff has pointed to evidence in the record that could permit a reasonable trier of fact to find that Plaintiff suffered an objectively tangible harm as a result of the Oral Admonishment Confirmed in Writing and the 2011 performance appraisal, both of which were issued to Plaintiff during the February 17, 2012 meeting at which she was removed from the Security Division Director position.

As to the Oral Admonishment Confirmed in Writing, Plaintiff has cited evidence from which a trier of fact could infer that this admonishment amounted to more than a "mere scolding," *see* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 16, and that it instead provided additional grounds for, and/or "led to," Plaintiff's removal from the Director of Security position, *see* Pl.'s Opp'n, ECF No. [52], at 44.  Specifically, the declaration of Plaintiff's second-line supervisor, Ms. Greiner, indicates that the decision to issue the Oral Admonishment Confirmed in Writing and the decision to remove Ms. Locks from the Directory of Security position "were made together," and that the "same material was relied upon for both the admonishment and the decision to transfer Ms. Locks to another GS-15 position."  Greiner EEO Declaration, ECF No. [52-37], at 12.  Moreover, as noted by Plaintiff in briefing, the Oral Admonishment Confirmed in Writing expressly states that Plaintiff's "alleged failure to report the arrests of" Mr. Brown "is considered misconduct . . . in direct violation of" a written Treasury directive that would "not be tolerated,"

and that "[a]ny repetition of this offense or other misconduct may result in disciplinary action, up to and including removal." Oral Admonishment Confirmed in Writing, ECF No. [52-17]. In light of the foregoing, the Court finds that there is sufficient evidence in the record such that a reasonable trier of fact could find that Plaintiff suffered an objectively tangible harm as a result of the Oral Admonishment Confirmed in Writing. *See Baloch*, 550 F.3d at 1199.

Plaintiff has also cited evidence in the record from which a trier of fact could infer that her 2011 overall performance appraisal rating of "Exceeds Expectations" affected her bonus for that year. As a preliminary matter, it appears undisputed that the 2011 performance appraisal was the first time in Plaintiff's tenure as Director of Security that she received an appraisal lower than the highest "Outstanding" level. *See* Pl's Stmt. ¶ 112; Def.'s Stmt. ¶ 27; Locks Decl., ECF No. [52-26], at ¶ 28. With her rating of "Exceeds Expectations," Plaintiff received a $1,600 cash bonus, which was lower than any bonus she had received in previous years, when her appraisal rating was "Outstanding." *See* Pl's Stmt. ¶ 113; Locks Decl., ECF No. [52-26], at ¶ 28; *see also* Plaintiff's 2011 Performance Appraisal, ECF No. [52-18]. Specifically, for the years 2006-2010, Plaintiff received bonuses in the amounts of $2,500, $3,300, $3,060, $5,000, and $3,750, respectively. *See* Plaintiff's 2006-2010 Performance Appraisals, ECF No. [52-19]. Furthermore, Plaintiff cites agency policies—which are also cited by Defendant—which demonstrate that the maximum bonus Ms. Locks could have received in 2011 would have been $2,000 higher, if she had received an overall rating of "Outstanding," as opposed to "Exceeds Expectations." *See* Manual of Administration: Performance Appraisal System, Exh. 6 to Declaration of Brian Self, ECF No. [51-5], at Bates No. 739, 754. Accordingly, the Court finds that that there is sufficient evidence in the record such that a reasonable trier of fact could find that Plaintiff suffered an objectively tangible harm as a result of her 2011 overall performance appraisal rating of "Exceeds Expectations."

*Russell v. Principi*, 257 F.3d 815, 817-19 (D.C. Cir. 2001) (lowered performance appraisal can qualify as adverse action where size of bonus is tied to the rating).

**C.  The rescission of Plaintiff's selection for the Director of ESOD position.**

Plaintiff also alleges that the rescission of her selection for the Director of the Enterprise Security Operations Division ("ESOD") position constitutes a separate adverse action distinct from the alleged actions discussed above.  Plaintiff's position, however, is not supported by the record or her own pleadings.  Plaintiff states in her Revised Statement of Genuine Issues that "[b]y removing Ms. Locks from her position as the Director of Security, [D]efendant also effectively revoked its competitive selection for her to be the Director of the [ESOD], a position that she was competitively selected to assume upon the completion of a merger between FMS and the Bureau of Public Debt ("PBD").  Pl.'s Stmt. ¶ 98.  Plaintiff has not submitted any evidence indicating that the rescission of her selection for the ESOD Director position was a personnel action distinct from her reassignment in February 2012 out of the Security Division Director position.  As such, the rescission of Plaintiff's selection for the ESOD Director position cannot be considered a separate and distinct adverse action resulting in an objectively tangible harm on Plaintiff.  *See Douglas,* 559 F.3d at 552.[10]

The Court notes, however, that Plaintiff may argue that the rescission of Plaintiff's selection for the ESOD Director position is evidence of an objectively tangible harm faced by Plaintiff because of her removal from the Director of Security position.  *See* Part III.A, *supra*.

---

[10] The Court also notes that because the Court finds that the rescission of Plaintiff's selection for the ESOD Director position cannot be considered a separate and distinct adverse action, the Court finds it unnecessary to address Defendant's alternative argument that Plaintiff did not assert the rescission of her Plaintiff's selection for the ESOD Director position as a distinct claim during the EEO process.  *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 22.

**D.  Discriminatory Intent**

Having found that there is sufficient evidence in the record such that a reasonable trier of fact could find that Plaintiff has suffered an adverse action, the Court now considers whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).[11]   Effectively, "[t]his boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?" *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).

Therefore, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision[s] [were] made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  A plaintiff may make the requisite showing by relying on "(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

Here, Defendant asserts that Plaintiff's reassignment from the Director of Security position was a "management decision reached by her supervisors based on the loss of confidence in [Ms.]

---

[11]  As the D.C. Circuit has instructed, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494.

Locks' ability to continue to serve in the role as the Security Division Director." Def.'s Mem. in Support of Mot., ECF No. [51-2], at 28. According to Defendant, her position was "one of special trust and sensitivity that required absolute integrity and the need to avoid any appearance that Security Division personnel were excused from abiding by the rules." *Id.*; *see also* Greiner EEO Declaration, ECF No. [52-37], at 11. Defendant contends that Ms. Locks' supervisors—Ms. Greiner and Mr. Kuyumjian—lost confidence in Ms. Locks' abilities because "she failed to report to the OIG that an employee in her office had been arrested and, as justification, claimed not to be aware" of her reporting obligations under applicable Treasury policies. Def.'s Mem. in Support of Mot., ECF No. [51-2], at 29. In support of its position, Defendant cites a November 21, 2011 phone call between Ms. Greiner and Jason Metrick, an employee within OIG. *See* Greiner EEO Declaration, ECF No. [52-37], at 11. Defendant maintains that during that phone call, Mr. Metric conveyed to Ms. Greiner the "seriousness of the allegations and preliminary findings" concerning Ms. Locks' failure to report Mr. Brown's arrest. *Id.* Defendant also maintains that Mr. Metrick indicated that he no longer felt comfortable submitting certain investigative reports to Ms. Locks and requested that in the future any such reports be submitted directly to Ms. Greiner. *See id.*[12]

Defendant also maintains that Ms. Locks' first-line supervisor, Mr. Kuyumjian, issued Plaintiff's Oral Admonishment Confirmed in Writing because of her "admitted failure to report

---

[12] Defendant also contends that Ms. Locks failed to be forthcoming during the OIG interview process. Defendant notes that following her first interview with an OIG investigator in October 2011, Ms. Locks "did not make any attempt to contact the OIG to advise the investigator that she had made a misstatement during her first interview." Def.'s Mem. in Support, ECF No. [51-2], at 10 n.6. Rather, "it was OIG that initiated the second interview after receiving an account that conflicted with the information that Locks had provided during her first interview." *Id.*
In response, Plaintiff maintains that after the first OIG interview, Mr. Brown approached her and reminded her that he had told her of this arrest in 2008, but that OIG contacted her and scheduled the second interview—which took place several weeks after the first—"[b]efore she had the chance to reach out to OIG and inform that she was mistaken in her first interview." Pl.'s Opp'n, ECF No. [52], at 19.

Brown's arrest to the OIG as required by Treasury policy." Def.'s Mem. in Support of Mot., ECF No. [51-2], at 30; *see also* Kuyumjian EEO Declaration, ECF No. [51-14], at 23; Oral Admonishment Confirmed in Writing, Exh. 6 to Declaration of Brian Self, ECF No. [51-5]. Defendant contends that the issues addressed in the OIG Report concerning the reporting of Mr. Brown's arrest also impacted Plaintiff's performance evaluation in the areas of leadership and customer-employee perspective. Def.'s Mem. in Support of Mot., ECF No. [51-2], at 30-31; *see also* Greiner EEO Declaration, ECF No. [52-37], at 4, 11.

In response, Plaintiff cites deposition testimony suggesting that in 2008, many FMS managers were unaware of the reporting requirements under the applicable policy, Treasury Directive 40-01. *See* Pl.'s Opp'n, ECF No. [52], at 32; *see also* Locks Declaration, ECF No. [52-26], at ¶¶ 20, 33; Agnew Dep., ECF No. [52-27], at 33-34, 36, 73; Small Dep., ECF No. [52-34], at 48, 50-51; Covert Dep., ECF No. [52-28], at 40-41, 52-53, 59, 67-68. In addition, Plaintiff cites deposition testimony, which suggest that Security Division employees were not made aware of Treasury Directive 40-01 until January 2009, several months *after* Ms. Locks was informed of Mr. Brown's arrest. *See* Pl.'s Opp'n, ECF No. [52], at 32; *see also* Agnew Dep., ECF No. [52-27], at 33-34, 36, 73; Small Dep., ECF No. [52-34],  at 48, 50-51; Covert Dep., ECF No. [52-28], at 40-41, 52-53, 59, 67-68; Locks Declaration, ECF No. [52-26], at ¶ 11. If proven as true, such facts would support Plaintiff's theory that the only reporting practice in effect before 2009 was informal and strictly internal. *See* Locks Declaration, ECF No. [52-26], at ¶ 13.

Plaintiff also cites deposition testimony and internal records in support of her argument that after 2009, the Treasury policy was not consistently enforced. As noted by Plaintiff, the Treasury policy at issue also mandated that all Treasury employees report instances of waste, fraud, and abuse to OIG. *See* Pl.'s Stmt. ¶ 44; Def.'s Resp. Stmt. ¶ 44. Plaintiff cites an incident in 2011,

in which Ms. Greiner and Mr. Kuyumjian, the two Caucasian decision-makers at issue, were aware of a Caucasian IT Specialist's waste of more than $40,000 in government funds, but did not report the waste to OIG and did not face discipline pursuant to Treasury Directive 40-01. *See* Pl.'s Stmt. ¶¶ 45-50; Def.'s Resp. Stmt. ¶¶ 45-50; *see also* Locks Declaration, ECF No. [52-26], at ¶ 42; Emails re: Wireless Charges, ECF No. [52-9]; Greiner Dep., ECF No. [52-29], at 146-49; Kuyumjian Dep., ECF No. [52-30], at 112-17.

In addition, Plaintiff cites other evidence as to the credibility of the decisionmakers on factual issues in dispute.  For example, Ms. Greiner states in her deposition that she has known of the policy requiring arrests to be reported to OIG as early as 2002; however, Ms. Greiner also wrote an email in 2012 about the reporting of employee arrests, asking if OIG "need[ed] to be involved in the process at all." *Compare* Greiner Dep., ECF No. [52-29], at 114 *with* Greiner Emails Re: IG Involvement, ECF No. [52-2].

Plaintiff also cites deposition testimony indicating that managers were required to consult Human Resources for guidance when proposing disciplinary action, but that neither Ms. Greiner nor Mr. Kuyumjian consulted the Human Resources official involved in the disciplinary actions against Ms. Locks about the possibility or propriety of reassigning Plaintiff.  *See* Washington Dep. at 21, 52.  Plaintiff also cites deposition testimony from that Human Resources official, indicating that the official is unaware of any other employee who has been disciplined for failing to report an arrest to the OIG and that an employee cannot be punished retroactively for the violation of a policy that post-dates their alleged misconduct. *See id.* at 23, 34-35.

Finally, Plaintiff cites evidence regarding Defendant's alleged history of discriminatory treatment of African Americans.  Plaintiff cites her own observations of Mr. Kuyumjian's alleged disparate treatment of other African Americans under her supervision, and asserts that she

confronted him over his alleged interference with her decision to hire an African American woman and her observations of his alleged mistreatment of African American employees.   Locks Declaration, ECF No. [52-26], at ¶ 5.  In addition, Plaintiff cites testimony by an African American security personnel specialist regarding alleged discriminatory treatment on the part of Mr. Kuyumjian with regard to retirement buyout options.  Covert Dep., ECF No. [52-28], at 21-23, 28-29, 33-35.

Upon review of the parties' submissions, the Court finds that Plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady*, 520 F.3d at 494.  The evidence submitted by Plaintiff can be inferred in different ways, including to support a conclusion that Defendant's explanation is "unworthy of credence" and thus "probative of intentional discrimination."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000).

Accordingly, the Court shall deny Defendant's Motion for Summary Judgment with regard to Plaintiff's discrimination claim.

## E.  Reinstatement

Finally, in her Prayer for Relief, Plaintiff states that she seeks an order "reinstating plaintiff in a position comparable to her former position as Director of the Security Division . . ., her intended position as Director [of] the Enterprise Security Operations Division, or in a comparable position."  Compl., Prayer for Relief ¶ B.  However, as Defendant point out in its Motion for Summary Judgment, it is undisputed that Plaintiff has already resigned her position from the agency.  *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 32.  In December 2013, Plaintiff submitted a voluntary buyout and retirement application, requesting January 3, 2014 as her date of

separation.  *See* Notification of Personnel Action, Ex. 13 to Declaration of Brian Self, ECF No. [51-5], at 2-3.  Plaintiff's application was accepted, she receive a buyout payment of $25,000, and her retirement became effective on January 3, 2014, as she requested.  *See id.* at 1, 4.

Defendant contends that Plaintiff's voluntary retirement precludes a reinstatement remedy. *See* Def.'s Mem. in Support of Mot., ECF No. [51-2], at 32-33.  Plaintiff has offered no response to Defendant's argument on this issue.  *See* Def.'s Reply, ECF No. [58], at 1-2.  Plaintiff also has not asserted a "constructive discharge" claim or otherwise contended that her retirement was not voluntary.[13]

Upon review of Defendant's arguments, the record as a whole, and the applicable legal authorities, the Court agrees with Defendant that Plaintiff's voluntary retirement precludes her from her requested remedy of reinstatement.  *See, e.g.*, *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 72-73 (D.D.C. 2006) (holding that a voluntary resignation cuts off a plaintiff's eligibility to recover under Title VII beyond the date of the resignation); *see also id.* (citing cases).  Accordingly, the Court shall grant Plaintiff's Motion for Summary Judgment with regard to Plaintiff's request for reinstatement in a position comparable to her former position as Director of the Security Division.

//

//

//

//

//

//

---

[13] The Court also notes that Ms. Locks did not allege a constructive discharge claim in the administrative process that preceded this litigation.  *See* Def.'s Stmt. ¶ 41.

**IV.  CONCLUSION**

Accordingly, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's [51] Motion for Summary Judgment.   Specifically, the Court shall deny Defendant's Motion for Summary Judgment with regard to Plaintiff's discrimination claim, but shall grant Defendant's Motion for Summary Judgment with regard to Plaintiff's request for reinstatement in a position comparable to her former position as Director of the Security Division.

An appropriate Order accompanies this Memorandum Opinion.


                                          /s/
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge